1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT TACOMA

10   DAVID FOGLE,
                                                    CASE NO.     C08-5395RBL-KLS
11                        Plaintiff,
                                                    REPORT AND
12        v.                                        RECOMMENDATION

13   MICHAEL J. ASTRUE, Commissioner of             Noted for May 15, 2009
     Social Security,
14
                          Defendant.
15

16

17         Plaintiff, David Fogle, has brought this matter for judicial review of the denial of his applications

18   for disability insurance and supplemental security income ("SSI") benefits.  This matter has been referred

19   to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and

20   as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the

21   parties' briefs and the remaining record, the undersigned submits the following Report and

22   Recommendation for the Court's review.

23                              FACTUAL AND PROCEDURAL HISTORY

24         Plaintiff currently is 45 years old.[1] Tr. 45.  He has a high school education and past work

25   experience as a building maintenance worker, kitchen helper and construction worker. Tr. 404, 469-70.

26         Plaintiff filed an application for disability insurance and one for SSI benefits on January 23, 2004,

27   ─────────────────────

28         [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
     Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

and February 14, 2007, respectively, alleging disability as of December 31, 2000, due to back and foot problems and a schizoid-type personality disorder. Tr. 17, 54-56, 396-97. His applications were denied initially and on reconsideration. Tr. 17, 45-46, 48, 51.

A hearing was held before an administrative law judge ("ALJ") on January 23, 2007, at which plaintiff, represented by counsel, appeared and testified. Tr. 392-422. Plaintiff's mother also appeared at the hearing, and began to testify, but, as discussed in greater detail below, was unable to complete her testimony at the time, because the ALJ continued the hearing to allow for further development of the documentary record. Tr. 416-22. A vocational expert appeared at the hearing as well, but because the hearing was continued, did not testify. Tr. 392-422.

On August 15, 2007, another hearing was held before a second ALJ, at which plaintiff, represented by counsel, again appeared and testified, as did a different vocational expert. Tr. 423-81. Following this hearing, plaintiff amended his alleged onset date of disability to October 2002. Tr. 17, 178. On August 29, 2007, the second ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1) at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since his alleged amended onset date of disability;

(2) at step two, plaintiff had "severe" impairments consisting of low back strain, obesity, schizoid personality disorder traits, and rule-out learning disorder;

(3) at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) after step three but before step four, plaintiff had the residual functional capacity to perform light work, with certain additional non-exertional limitations;

(5) at step four, plaintiff was unable to perform his past relevant work; and

(6) at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 17-27. Plaintiff's request for review was denied by the Appeals Council on May 30, 2008, making the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 404.981, § 416.1481.

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

On June 23, 2008, plaintiff filed a complaint in this Court seeking review of the second ALJ's decision. (Dkt. #1-#3). The administrative record was filed with the Court on October 8, 2008. (Dkt. #11). Plaintiff argues the ALJ's decision should be reversed and remanded to the Commissioner for further administrative proceedings for the following reasons:

(a)     the ALJ erred in evaluating the medical evidence in the record;

(b)     the ALJ erred in failing to determine the severity of plaintiff's syncopal episodes and light-headedness;

(c)     the ALJ erred in assessing plaintiff's credibility;

(d)     plaintiff's mother was improperly prevented from testifying at the first hearing;

(e)     the ALJ erred in assessing plaintiff's residual functional capacity; and

(f)     the ALJ improperly disregarded vocational expert testimony.

For the reasons set forth below, the undersigned does not agree the ALJ erred in determining plaintiff to be not disabled, and therefore recommends the ALJ's decision be affirmed.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.     <u>The ALJ Properly Evaluated the Medical Evidence in the Record</u>

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 601 (9th

Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility."  Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons."  Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Id.  The ALJ also may draw inferences "logically flowing from the evidence."  Sample, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion."  Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record."  Id. at 830-31.  However, the ALJ "need not discuss all evidence presented" to him or her.  Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected."  Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant.  Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole."  Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician."  Lester, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record."  Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.      Dr. Bhaskar

Plaintiff was examined by Padmini Bhaskar, M.D., in late March 2004, who diagnosed him with

right ankle pain and swelling and low back pain, due or secondary to "occupational hazards." Tr. 296.  Dr. Bhaskar also provided the following functional assessment:

> . . . The number of hours that the claimant could be expected to stand and walk in an eight-hour workday is approximately four hours, but if he has to, he needs to sit down and rest.
>
> The number of hours that the claimant could be expected to sit is without limitation. Some limitation could be present because of the low back pain, which he has developed secondary to his leg pain.
>
> It is not necessary for him to use any assistive device at present.
>
> There is no limitation to the amount of weight that the claimant could lift and carry frequently or occasionally.
>
> There are some postural limitations noted on bending, stooping, and crouching occasionally, but not frequently.  The limitation could be due to his low back pain, which he has developed as a consequence of prolonged standing at his work washing dishes for many hours while standing.
>
> There are no manipulative limitations noted on handling, feeling, grasping, and fingering at present, but there is some discomfort on his right wrist on movement, which would need to be investigated.
>
> There are no relevant visual or communicative limitations noted.
>
> The only workplace environmental limitation could be due to the swelling and pain of his ankles because of prolonged standing, which needs to be investigated and treated, as well as his low back pain.  Some amount of depression can also cause some limitation in his work.

Tr. 296-97.

With respect to Dr. Bhaskar's functional assessment, the ALJ found in relevant part as follows:

> . . . The March 2004 assessment by Dr. Bhaskar finding no limitations in the claimant's capacity for lifting and carrying is . . . not entirely credited because subsequent medical records (and the claimant's credible testimony) corroborate significant weight limitations on his work capacity (See Ex. 5F).  However, Dr. Bhaskar's assessment that the claimant can only stand and walk a total of 4 hours per 8-hour day is not adopted because it is not supported by individual reports in the record, the claimant's stated wide ranging daily activities, his lack of medical treatment, or the record as a whole as summarized herein.  Indeed, as noted above the claimant himself has consistently maintained that he is not disabled and is, in fact, able to perform a wide range of work. In short, the evidence presented here demonstrates that the claimant remains capable of performing a wide range of light exertional work activity. . .

Tr. 25.  Plaintiff challenges the ALJ's statement that Dr. Bhaskar's limitation on standing and walking is not supported by the evidence in the record as a whole, arguing that the opposite is true.  The undersigned disagrees.

In support of his challenge, plaintiff points to treatment notes from a registered nurse, Margene

Fields, A.R.N.P., in which she commented that he was experiencing swelling and pain in his right leg and ankle, and that the pain affected his ability to stand for prolonged periods at work. Those notes, however, do not provide the support plaintiff asserts they do. Plaintiff did complain of pain in his right leg in early April 2004, and Ms. Fields did note pain with palpation at the time, and diagnosed him with right ankle "[p]ain/sprain". Tr. 333. Neither plaintiff nor Ms. Fields, though, stated that the pain interfered with his ability to perform his job. Indeed, plaintiff reported that he stood "on his feet for many hrs – 9-10 a day for 3 days/wk" as a dishwasher. Id. No work-related limitations, furthermore, were assessed.

In mid-May 2004, plaintiff again presented with complaints of pain in his right ankle due to having hyperflexed his right foot when riding his bicycle five days previously. Id. The fact that plaintiff was able to ride his bicycle, and apparently only returned to see Ms. Fields because he newly injured his right ankle, indicates the prior pain and swelling he experienced does not support the standing and walking limitations noted above found by Dr. Bhaskar. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant must show he or she suffers from medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for continuous period of not less than twelve months). This is supported by the fact that Ms. Fields found only "minimal" swelling and pain upon examination of plaintiff's right ankle. Id.

Plaintiff again saw Ms. Fields in late July 2004, with complaints of pain and swelling in his right ankle. Tr. 299. Interestingly, Ms. Fields noted that while she had given plaintiff "an x-ray slip" when she saw him in mid-May 2004, he "decided not to do this." Id. In fact, he reported that the "pain and swelling at that point did resolve." Id. At his late July 2004 visit, furthermore, plaintiff once more told Ms. Fields that he stood "on his feet a lot w/doing dishes at the restaurant," and was complaining of experiencing pain for only the past day. Id. He was found to have good range of motion of his ankle without any pain, with the only remarkable finding being that he was "very flat-footed." Id. Although Ms. Fields diagnosed him with "[s]prain vs. gout," and stated that he was "off work x 3 days," this evidence too establishes plaintiff's alleged right ankle pain and swelling did not significantly affect his ability to work for the period of time required to establish disability.

Plaintiff also points to a treatment note from Ms. Fields, dated January 26, 2006, in which plaintiff complained of pain "shooting down" his right leg, and that it was "very painful" when he walked around.

Tr. 332. The only significant finding Ms. Fields could find on physical examination, though, was pain with deep palpation of his right gluteal maximus. Id. Otherwise, clinical findings were unremarkable. Id. Ms. Fields did diagnose plaintiff with "[p]ain/strain lumbar spine w/sciatica," but she imposed no work-related limitations on him. Id. It is true that plaintiff was fitted for orthotics in late April 2006. Tr. 335. This fact alone, however, does not at all indicate that he was significantly limited in his ability to stand and/or walk. Indeed, at the second hearing, plaintiff testified that his ankle problem was "healed", and that he wore his orthotics to correct his "walking situation." Tr. 453.

Lastly, in terms of medical evidence, plaintiff points to progress notes concerning his chiropractic treatment, which took place between early October 2006, and late January 2007, and which plaintiff states show the presence of back and right hip pain. Again, while true (Tr. 338-70), the existence of pain alone does not establish significant work-related limitations, let alone disability. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment is insufficient proof of disability). Further, while it is also true that those progress notes show plaintiff did report during the month of October 2006, that standing and walking aggravated his pain, neither he nor his treatment provider actually stated that his ability to stand and/or walk were limited thereby. Tr. 360-70. In addition, the record shows plaintiff's pain lessened considerably during the course of his treatment, resulting in a reported "80% improvement" in his symptoms by early January 2007. See Tr. 338-60.

Plaintiff also incorrectly asserts the ALJ was wrong in finding that his activities of daily living did not support the standing and walking limitation found by Dr. Bhaskar. Plaintiff relies on the statements he made in a daily activities questionaire he completed (see Tr. 71-74) and some of the testimony he gave at the first hearing (see Tr. 411-12) as support for that assertion. The substantial evidence in the record, however, supports the ALJ's findings on this issue. For example, in early January 2001, though admittedly prior to his alleged amended onset date of disability, plaintiff reported being "very active at his work and . . . able to carry out both his work activities and activities of daily living." Tr. 285. He reported in early February 2001, working as a "janitor/gardener/security guard" and maintenance worker. Tr. 223, 225. In neither case did plaintiff indicate any problems with standing and/or walking. So too did plaintiff report working as a handyman without such problems in late September 2001. Tr. 281.

In late March 2004, plaintiff reported that he worked as a dishwasher, pedaled his bicycle to work, and had "to stand a long time to do the dishes," more specifically "almost seven hours a day." Tr. 289,

292-93. As noted previously, plaintiff also reported in early April 2004, standing on his feet "for many hrs – 9-10 a day for 3 days/wk" as a dishwasher, and in late July 2004, standing "on his feet a lot w/doing dishes at the restaurant." Tr. 332-33. In early March 2007, plaintiff stated that he was able work "[n]o problem," except for "some anger problems," and that most recently he had worked digging ditches for three days in September 2006. Tr. 383. Indeed, he reported having performed "lots of temporary jobs," mostly of the "heavy industrial" variety with "no difficulties at all." Id.

As for plaintiff's testimony, at the hearing, he testified that he did not really have any physical limitations that made shopping painful for him or limited him in any way. Tr. 442. He also testified at the time that in terms of yard work, he mowed and trimmed the lawn, and even got "a little carried away with" pruning. Tr. 446. Performance of these activities generally require the ability to stand and/or walk. Most significantly, plaintiff testified that he probably could stand and walk "about six hours" with normal breaks during a workday. Tr. 448. Clearly, that is greater than the ability to stand and walk for approximately four hours in a workday as opined by Dr. Bhaskar. Indeed, plaintiff further testified that as long as he wore his orthotics, he had no problems with these activities. Tr. 448-49. Lastly, he testified that he left his job as a dishwasher not because of any problems standing for so long, but because he got angry at a co-worker and was fired for that incident. Tr. 462-64.

Plaintiff makes much of the fact that the ALJ found him to be generally credible. But, as discussed above, that finding of credibility is not inconsistent with the ALJ's determination that his activities of daily living did not support the standing and walking limitation opined by Dr. Bhaskar. That is, plaintiff's own testimony and self-reports belie that opined limitation. Other objective medical evidence in the record, furthermore, supports the ALJ's determination here. In late September 2004, for example, Alnoor Virji, M.D., a non-examining consulting physician, opined that plaintiff was capable of standing and/or walking for about six hours in an eight-hour workday. Tr. 317.

Although plaintiff is correct that generally the opinion of an examining physician is given greater weight than that of a non-examining physician, the latter's opinion may constitute substantial evidence if it is consistent with other independent evidence in the record, as it is here for the reasons discussed above. See Lester, 81 F.3d at 830-31; Tonapetyan, 242 F.3d at 1149. Plaintiff asserts the ALJ's reliance on Dr. Virgji's report in rejecting the limitations Dr. Bhaskar placed on his ability to stand and walk should be

deemed inadequate, because the ALJ failed to indicate what portion of that report was accorded significant weight and did not discuss that report in formulating his assessment of plaintiff's residual functional capacity ("RFC"). <u>See</u> Tr. 25. But that report specifically was noted in the section of the ALJ's opinion discussing the evidence supporting the RFC assessment. <u>See</u> Tr. 23-25. Dr. Virji's report, furthermore, found plaintiff to be capable of standing and/or walking at the light exertional level of work, which clearly is consistent with the ALJ's own RFC assessment.[3]

B.   <u>Dr. Bremer</u>

In early March 2007, plaintiff was evaluated by Jeff Bremer, Ph.D., who diagnosed him with an asperger's disorder, a reading disorder, a mathematics disorder, a disorder of written expression, and a global assessment of functioning ("GAF") score of 60, both current and the highest in the past year. Tr. 387. Dr. Bremer further opined in relevant part that:

> Mr. Fogle would, almost certainly, be seen as a bit "odd" or "off" in social situations – interacting with the public, coworkers, classmates, or supervisors, for example. He has, by history, consistently under performed in social role expectations and performance, as a result, as it pertains to relationships, friends, and jobs.
>
> Mr. Fogle presents with a qualitative impairment in social interaction, including impairment in the use of non-verbal behaviors, to develop peer relationships appropriate to his age and developmental level, and the degree of social and emotional reciprocity. He also has some unusual, though not necessarily stereotype, interests and activities – attending AA meetings even though he is not an alcoholic and carving crucifixes, for example. His social interactions are decidedly inconsistent with his general level of intellectual functioning and verbal communication skills.
>
> Mr. Fogle is severely Learning Disabled in Reading, Writing, and Arithmetic. It is not surprising, in this light, that he has found himself in primarily industrial laboring positions. He would almost certainly not do well in format or extended classroom training, both for social and learning disability issues. I believe, nonetheless, that he could manage his own finance . . .

<u>Id.</u>  The ALJ evaluated Dr. Bremer's opinion as follows:

> . . . After examining the claimant, Dr. Bremer's primary diagnosis was of Asperger's Disorder under Axis I of his clinical evaluation; this primary diagnosis was coupled with specific disorders as to Reading, Mathematics and Written Expression identified further with specific diagnostic codes. In the body of his evaluation, Dr. Bremer reaffirmed the claimant's significant academic limitations and also opines the claimant

---

[3]Plaintiff also argues in his reply brief that the ALJ failed to consider the late April 2006 opinion of Terrence Hess, D.P.M., that he had a "[p]osterior tibial tendon partial tearing, right side," which he asserts supports the standing and walking limitation found by Dr. Bhaskar. Tr. 335. Because plaintiff did not raise this issue in his opening brief, however, it should not be considered here. Nevertheless, the undersigned does note that even if plaintiff had properly raised that issue, it would have been found to have been without merit, since, as discussed above, the mere existence of a medical impairment and related pain symptoms alone is not sufficient to establish disability, without at least some evidence of actual work-related functional limitations.

has significant social impairment. The doctor does not specifically attribute these "odd social behaviors" directly to his finding of Asperger's disorder but same may be implied from the specific context in his DISCUSSION and in the report as a whole. However, as noted above despite the claimant's odd social behaviors, he has stated that he loves to be around some people, attends regular 12-step meetings twice a week and attends church, has at least one friend, and has generally interacted appropriately during the various consultative examinations and during both of his administrative hearings in this matter. Notwithstanding the primary diagnosis of Asperger's, the Court so finds, after weighing the totality of the evidence and assessing the claimant in person during the hearing, the claimant is no more than mildly impaired in social functioning.

Tr. 25.

Plaintiff argues that although the ALJ mentions Dr. Bremer's report and opinion in his decision, he never discusses the weight he gave. Clearly, though, this is not the case, as the ALJ expressly stated what weight he gave to Dr. Bremer's opinion regarding plaintiff's social functioning. Plaintiff further argues in his opening brief that the ALJ failed to state whether he considered any ambiguities or inconsistencies between Dr. Bremer's opinion and the opinions of Jacquelyn Ball, M.D., and Scott Alvord, Psy.D., two other non-examining medical sources in the record. See (Dkt. #12, p. 11). But plaintiff does not state what ambiguities or inconsistencies the ALJ was required to consider, but failed to do so. Indeed, shortly thereafter in his opening brief, plaintiff asserts these three opinions are entirely consistent concerning his social functioning. See (Id. at p. 12).

Plaintiff also argues the ALJ erred in stating that Dr. Bremer concluded he was malingering, when it actually was Dr. Alvord who opined as to this based on the psychological testing he conducted. See Tr. 378. However, the undersigned finds this error to be harmless. See Stout v. Commissioner, Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion). Plaintiff disagrees that this error was harmless, arguing it is unclear whether the ALJ's statement colored his opinion regarding Dr. Bremer's findings and opinion. The ALJ, though, gave no indication in the section of his decision where he set forth his actual analysis of Dr. Bremer's report that he relied at all on the issue of malingering. In addition, the ALJ did correctly note earlier in his decision that it was Dr. Alvord who found evidence of malingering. See Tr. 21. Accordingly, plaintiff has failed to show the subsequent erroneous reference thereto was prejudicial.

The undersigned, furthermore, agrees with the ALJ that the substantial evidence in the record does support a finding of mild impairment for the most part in the area of social functioning. For example, in response to a question from Dr. Ball in late March 2004, as to whether he experienced anxiety when he

was around other people, plaintiff responded as follows:

> . . . "They (family) say I have an anxiety disorder. The only reason I have anxiety would depend on what's going on in the day. I'm not a loner. Some people I like, some I don't." The claimant reports that intermittently he will feel anger. He states, "I'll go somewhere and think oh no, this won't work out, but then it does, it works out fine. Anxiety does not keep me at home."

Tr. 287. While plaintiff reported that he preferred "a lot of solitary activities" and did "not have a lot of close friends," he had "many acquaintances" and did "not feel uncomfortable when he" was "around other people." Id. Plaintiff further reported that he liked conversing with people whom he met for the first time, but that he got "nervous about what to say" when he first starts talking to people whom he knows and had not seen for awhile. Tr. 287-88. Dr. Ball further noted that plaintiff "interacted appropriately" both with himself and with staff, which he felt suggested an ability to do so with others, i.e., supervisors, co-workers and the public, in the workplace. Tr. 291.

In early March 2007, plaintiff told Dr. Bremer he went to Alcoholics Anonymous ("AA") meetings two days a week "just to be around people," and liked "to be friendly" and "wave to people." Tr. 383-84. This despite being described by Dr. Bremer as presenting "as quite 'odd' and socially 'off'," although he was "not entirely ineffective socially." Tr. 384. Plaintiff also told Dr. Bremer that he was going to travel to California in a couple of weeks to visit some friends of his. Id. In late March 2007, while Dr. Alvord stated plaintiff presented "as somewhat socially inept, isolated, and lacking a strong desire for intimacy," he nevertheless believed plaintiff was "able to function adaptively in society." Tr. 379. Plaintiff himself reported having "friends associated with his church." Tr. 375.

At the first hearing, furthermore, plaintiff, as he earlier had reported to Dr. Bremer, testified that he went to AA meetings because he liked "being around other people." Tr. 408. Plaintiff also testified that he talked to five to ten people from his AA meetings on the telephone each day, and that he also meets with them face to face at his church. Tr. 408-09. While plaintiff further testified at that hearing that he got "angry a lot" when other people made fun of him or told him to speed up while working, and that he lost at least some jobs because of his anger, he testified as well at the time that he tried and did at times get along with other people. Tr. 413, 416.

In addition, at the second hearing, when asked if he was shy, plaintiff testified he did not know what the definition of that word meant, thereby indicating he was not shy at all. Tr. 453. Plaintiff also

testified that once more not only did he got to AA meetings to be "around other people," he even had lead such meetings twice a week over a period of three months. Tr. 454-56. He testified that he got along with his neighbors as well. Tr. 461. Accordingly, while plaintiff has alleged he has anger issues, which he asserts has interfered with his ability to get along with others and maintain employment, the substantial evidence in the record shows he enjoys being around other people, and indeed actively seeks opportunities to do so. As such, the ALJ did not err in discounting Dr. Bremer's opinion on this basis.

## II.     The ALJ's Step Two Findings

At step two of the sequential disability evaluation process, the ALJ must determine if an impairment is "severe." Id. An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(iii), (c), § 416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1. Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b), § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988). Plaintiff has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The step two inquiry described above, however, is a de minimis screening device used to dispose of groundless claims. Smolen, 80 F.3d at 1290.

As noted above, the ALJ found plaintiff had low back strain, obesity, schizoid personality disorder traits, and rule-out learning disorder, which he found to be severe. Tr. 20. Plaintiff argues the ALJ erred in not also finding his syncopal episodes and light-headedness to be severe. Specifically, plaintiff argues he testified at the second hearing that he had experienced an episode of light-headedness a couple of months prior to that hearing (Tr. 458), and there is no indication in the record that his light-headedness or syncopal episodes had resolved by then. Plaintiff asserts the ALJ thus erred in failing to fully develop the record by not questioning him further regarding the frequency and duration of his dizzy spells, and in not considering the impact they had on his ability to work. The undersigned disagrees.

Plaintiff appears to equate the existence of an impairment with the presence of significant work-related limitations, of which the record in this case contains no real evidence. See Matthews, 10 F.3d at 680. First, that plaintiff may have received treatment for a seizure disorder for a period occurring many years prior to his alleged onset date of disability is irrelevant to the consideration of impairment severity here, even if there is a connection – which plaintiff has not made – between that disorder and the alleged syncopal or dizzy episodes. Plaintiff does not point to, nor does there appear to be any, evidence in the record that such a disorder is more than remotely present for him, let alone has, or at any time in the past has had, any effect on his ability to work. Indeed, in early March 2007, plaintiff told Dr. Bremer that he had "not had any seizures" or taken any medication therefor as an adult. Tr. 382.

The record, though it does contain some evidence of syncopal or lightheadedness episodes, clearly shows the frequency and duration thereof to be hardly significant. For example, in early February 2001, it was reported that while plaintiff was "[p]ositive for a history of 'passing out' easily," no such episodes had occurred recently. Tr. 223. Although plaintiff was diagnosed as having experienced a syncopal episode in late January 2006, it was noted that while he reported having similar episodes in the past, the last time one had occurred was in 2000, when he suffered from only two of them. Tr. 322. Indeed, neurological findings obtained at the time were "unremarkable", and plaintiff was observed to be "feeling very well the next day." Tr. 322, 327-28. In mid-March 2006, plaintiff reported that "[h]is recurrent light-headedness" had "resolved since he started using decaf." Tr. 330.

At the first hearing, furthermore, plaintiff indicated his syncopal episodes or lightheadedness were not medical impairments. Tr. 410-11. It is true that at the second hearing plaintiff testified that "several months ago" he "was feeling kind of dizzy," and his mother told him to sit down. Tr. 458. As noted above, plaintiff argues this testimony should have resulted in the ALJ further developing the record regarding this alleged impairment. The duty to further develop the record, though, is triggered only when the evidence is ambiguous, or when it is inadequate to allow for the proper evaluation thereof. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001). Such is not the case here. The evidence in the record establishes plaintiff has had only some four episodes spaced several years apart since late January 2001. Nor does the evidence indicate such episodes – other than for perhaps a day or two – have affected his work-related functioning. The undersigned thus rejects the assertion that the ALJ should have considered this alleged

1    impairment or any claimed limitations stemming therefrom in determining plaintiff's ability to work.

2    III.    The ALJ's Assessment of Plaintiff's Credibility

3          Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

4    639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  Allen, 749

5    F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is

6    based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

7    claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as

8    long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148

9    (9th Cir. 2001).

10         To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

11   the disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must

12   identify what testimony is not credible and what evidence undermines the claimant's complaints."  Id.;

13   Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

14   malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

15   Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v.

16   Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

17         In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

18   evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

19   testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

20   also may consider a claimant's work record and observations of physicians and other third parties

21   regarding the nature, onset, duration, and frequency of symptoms.  Id.

22         Plaintiff argues that although the ALJ unequivocally stated he found him to be credible, the ALJ

23   did not include all of his alleged limitations in his RFC assessment, including the fact that he is forgetful,

24   does not get along with people, is easily angered, cannot lift more than 10 pounds, and cannot stand longer

25   than one hour at a time.  The undersigned, however, finds the ALJ did not err here.  First, in regard to both

26   the social functional limitations and the standing restrictions emphasized by plaintiff, as discussed above,

27   the ALJ did not err in finding only mild limitations in the area of social functioning or in rejecting the

28   specific standing restrictions asserted here.  As to plaintiff's testimony concerning these limitations and

1    restrictions, the undersigned finds the ALJ properly credited it.

2        In his decision, the ALJ did state that he found plaintiff "to be a generally credible witness," but he

3    then went on to note that plaintiff "consistently contended" he was able to work, specifically informing Dr.

4    Bremer of this. Tr. 24.  The ALJ pointed out as well that plaintiff indicated to Dr. Ball that it was not him

5    who believed he was disabled, but his family. Id.  As noted above, the ALJ then went on to evaluate and

6    discuss the overall evidence in the record, medical and otherwise, which he correctly found supported

7    these statements.  Thus, the ALJ's credibility determination must be seen in this light.  That is, the

8    testimony and self-reports provided by plaintiff as a whole actually indicate a much greater ability to work.

9        As to plaintiff's alleged lifting limitations, the ALJ actually credited them by restricting him to

10   only light work.  At the hearing, in response to questioning from the ALJ, plaintiff testified that he

11   probably could lift and carry 10 pounds for six hours in an eight-hour day with normal breaks. Tr. 447-48.

12   This is in general consistent with the lifting and carrying requirements for light work. See 20 C.F.R. §

13   404.1576(b), § 416.976(b) ("Light work involves lifting no more than 20 pounds at a time with frequent

14   lifting or carrying of objects weighing up to 10 pounds.").  The undersigned further notes the record

15   reveals that plaintiff has both testified and reported he could lift and/or carry weights in significant excess

16   of the 10-pound lifting limitation being claimed, thereby indicating plaintiff himself believed he also could

17   perform the less than frequent 20 pound lifting requirement as well. See, e.g., Tr. 72, 446-47.

18       Although the ALJ did not indicate how he dealt specifically with plaintiff's claim of forgetfulness,

19   once again, the ALJ's emphasis on the fact that plaintiff himself admitted he did not see himself disabled

20   due to any mental impairment, and plaintiff's own failure to point to any specific work-related limitations

21   resulting from this alleged impairment, again warrants a finding of no error here.  The record shows that

22   plaintiff did complain of memory loss in late December 2000, and in mid-January and early February

23   2001. Tr. 221, 242, 262.  In late February 2001, however, plaintiff reported having no memory loss. Tr.

24   189, 194. The late March 2004 mental status examination conducted by Dr. Ball found no evidence of

25   deficits in his memory as well. Tr. 290.  An early March 2007 mental status examination performed by Dr.

26   Alvord also indicated plaintiff's memory to be "generally within normal limits." Tr. 379.

27       Indeed, no medical source in the record opined as to any memory-related functional limitations.

28   Nor did plaintiff testify or report that his forgetfulness interfered with his past jobs.  Thus, the undersigned

finds that while the ALJ did consider plaintiff's alleged mental impairments, he correctly declined to adopt any limitations due to forgetfulness. Lastly, plaintiff asserts there is no affirmative evidence in the record that he was malingering. This, however, clearly is not true. As noted above, Dr. Alvord did find evidence of malingering on psychological testing, stating specifically in relevant part:

> Validity indicators . . . suggest Mr. Fogle's profile is invalid and therefore, not interpretable. Specifically, he responded in a manner consistent with an unsophisticated attempt to present himself in an unfavorable light or to highlight psychiatric distress. At times similar response styles are considered to reflect a "cry for help"; <u>in this case, it is my clinical opinion that secondary gain issues inherent in an evaluation of this nature motivated Mr. Fogle to exaggerate his level of distress.</u>

Tr. 378 (emphasis added). The ALJ noted this finding in his decision (Tr. 21, 24), but appeared not to give it much weight, because plaintiff's own reports indicated an ability to work. It seems clear, therefore, that the ALJ found plaintiff credible only to the extent that his own testimony was consistent with the evidence in the record as a whole, which itself was consistent with the ALJ's RFC assessment.

IV.    <u>Treatment of the Lay Witness Testimony at the First Hearing</u>

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001). An ALJ may discount lay testimony if it conflicts with the medical evidence. <u>Id.</u>; <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. <u>Lewis</u>, 236 F.3d at 512. The ALJ also may "draw inferences logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642.

As noted above, plaintiff's mother appeared and began testifying at the first hearing, but was not able to complete her testimony, because the ALJ continued the hearing so as to further develop the record. Plaintiff argues the ALJ erred by not letting his mother complete her testimony, because she was unable to attend the second hearing. But plaintiff fails to show how the ALJ at the first hearing could have known his mother would not be able to attend the next hearing, either at the time of the first hearing or when the next hearing was scheduled. Indeed, no mention of any inability on the part of plaintiff's mother to attend the second hearing was made by plaintiff or his legal counsel at that hearing, nor was any objection raised

as to proceeding therewith without her. The undersigned thus finds no error on the part of the first ALJ in continuing the first hearing as he did.

Plaintiff attaches to her reply brief a letter written by his mother, dated October 24, 2007, in which, plaintiff asserts, she references information stated in the offer of proof his legal counsel made at the first hearing. See (Dkt. #19, p. 3, Exhibit B); Tr. 399-400. The undersigned, however, declines to consider that letter as evidence in this case, given that this is the first time it has been presented. The determination as to whether to remand a case to the Commissioner on the basis of additional evidence submitted for the first time to federal court is governed by 42 U.S.C. § 405(g). Under that statutory provision, to justify remand, plaintiff must show that the additional evidence he submitted to this Court is both "new" and "material" to determining his disability, and that he "had good cause for having failed to produce that evidence earlier." Mayes v. Massanari, 276 F.3d 453, 462 (9th Cir. 2001).

To be material, "the new evidence must bear 'directly and substantially on the matter in dispute.'" Id. (citation omitted). Plaintiff also must demonstrate a "reasonable possibility" the new evidence "would have changed the outcome of the administrative hearing." Id. (citation omitted). To demonstrate "good cause," plaintiff must show the new evidence "was unavailable earlier." Id. at 463. However, the good cause requirement will not be met by "merely obtaining a more favorable report once . . . [his] claim has been denied." Id.

While the letter from plaintiff's mother arguably is material to this proceeding, plaintiff has failed to show good cause for not presenting that the evidence contained therein earlier. Although the letter was written after the second ALJ issued his decision, plaintiff does not explain why his mother could not have presented her observations to the ALJ earlier, or, indeed, why she could not have presented the letter to the Appeals Council, which issued its own decision several months after the date thereof. Thus, even though the information contained in the letter may reference that in the offer of proof provided by plaintiff's legal counsel, plaintiff still has the burden of demonstrating good cause for not getting it into the administrative record in a timely manner. He has failed to do so.

Also in his reply brief, plaintiff argues the ALJ failed to properly consider the record obtained from his chiropractic treatment providers. Again, however, plaintiff did not present this argument in his opening brief, and thus it is not appropriate to give it consideration here. As discussed above, furthermore,

progress notes from that treatment fail to show the presence of any specific work-related functional limitations and reveal that by the time treatment ended in late January 2007, an 80% improvement in the amount of pain experienced had occurred by plaintiff's own report.

V.    The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Here, the ALJ assessed plaintiff with the following residual functional capacity:

> **. . . the claimant has the residual functional capacity to perform light work except that he is precluded from climbing ladders, ropes, and scaffolds; other posturals are limited to occasional; no concentrated exposure to hazards such as machinery and heights; only occasional interaction with coworkers, supervisors, and the public; He is further limited to simple routine and repetitive tasks not performed in a fast production paced environment, involving only simple work-related decisions and few work place changes; and, finally, [the claimant] is limited in writing and reading at the 7th grade level and limited in math at the 3rd grade level. . . .**

Tr. 23 (emphasis in original).  Plaintiff argues the ALJ's RFC assessment is simply conclusory, somewhat speculative and contains insufficient rationale or reference to supporting evidence.  The undersigned finds this claim though to be wholly without merit.  While the above assessment is provided at the beginning of the section of the ALJ's decision dealing with this issue, the ALJ does go on to set forth his discussion of the evidence in the record and anlysis thereof to support his findings.  See Tr. 23-25.  Accordingly, the ALJ

1  adequately set forth his reasons for assessing plaintiff with the residual functional capacity he did, and the

2  undersigned finds nothing speculative or conclusory about it.

3      Plaintiff argues the ALJ cited no specific examples in the record that would indicate he could stand

4  and walk for more than four hours in an eight-hour workday or more than one hour at a time.  But the ALJ

5  set forth a detailed summary of the evidence in the record concerning plaintiff's physical impairments and

6  limitations, including both his own testimony, which, as discussed above, supports a finding that plaintiff

7  is capable of standing and/or walking for at least six hours a day, with no need to discontinue doing so

8  after only one hour. See Tr. 20-22, 24-25.  The undersigned also rejects plaintiff's contention that the

9  evidence in the record demonstrates that he is unable to perform full-time work on a regular and ongoing

10  basis, and that the ALJ thus erred in not including this limitation in his RFC assessment.

11      Residual functional capacity ordinarily is the "maximum remaining ability to do sustained work

12  activities in an ordinary work setting on a **regular and continuing basis**," meaning "8 hours a day, for 5

13  days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184 *2 (emphasis in original).

14  The RFC assessment, therefore, "must include a discussion of the individual's abilities on that basis." Id.

15  (emphasis added).  However, the ALJ need not make a specific finding as to a claimant's ability to sustain

16  employment, but rather such a finding may be subsumed within the residual functional capacity

17  assessment itself. See Frank v. Barnhart, 326 F.3d 618, 621 (5th Cir. 2003) (ALJ was not required to make

18  express determination as to whether work could be maintained on sustained basis, as nothing in record

19  suggested claimant was unable to do so); Perez v. Barnhart, 415 F.3d 457, 466 (5th Cir. 2005) (claimant

20  failed to offer any evidence his condition waxed and waned in intensity such that ability to maintain work

21  was not adequately taken into account in his RFC determination).

22      Plaintiff argues all of his work has been part-time, did not rise above the substantial gainful activity

23  level and he lost several jobs do to impairments in his social functioning.  The substantial evidence in the

24  record, however, indicates a greater ability on the part of plaintiff to do work full-time.  For example, in

25  late March 2004, plaintiff told Dr. Ball he thought it was "wrong" that his family wanted him to apply for

26  disability benefits on the basis of mental impairment. Tr. 287.  He also told Dr. Ball he was able to get the

27  dishes done at work in a timely manner. Tr. 289.  In addition, plaintiff reported that while he has had "lots

28  of temporary work," he was able to maintain "consistent employment over the last 15 years." Id.  Further,

1   although he reported that his most recent job was only part-time at 25 hours per week, he expressly stated

2   that he would "rather have a fulltime job," but there was "nothing open." Id.

3       As discussed above, plaintiff has reported standing on his feet at his dishwasher job for up to nine

4   to ten hours day. Tr. 333.  Although he also reported he did so for only three days a week (Id.), he told Dr.

5   Bhaskar as well that he stood "almost seven hours a day at his work," with no indication he did so only on

6   a part-time basis. Tr. 293.  When asked about "hurdles to finding or maintaining employment," plaintiff

7   told Dr. Alvord not that he physically or mentally was unable to work, but that while "sometimes" he got

8   "frustrated and quit," he "mostly" liked "to move around" and do his "own thing." Tr. 375.  As discussed

9   above, furthermore, plaintiff himself testified at the second hearing that he essentially he could perform at

10  least at the light work level for the entire day, without any indication that such could not be maintained for

11  the entire workweek. See Tr. 446-48.  The record overall thus does not support a limitation to being able to

12  perform only part-time work.

13      Plaintiff argues the ALJ erred in not including in his residual functional capacity assessment the

14  social functioning limitations discussed herein.  However, also as discussed above, the substantial

15  evidence in the record supports the ALJ's determination that plaintiff had no more than a mild impairment

16  in that area.   The ALJ, furthermore, did take into account plaintiff's learning disorder, limiting him to

17  being able to read and write at the 7th grade level and do math only at the 3rd grade level, which largely is

18  in line with the academic testing results obtained by Drs. Alvord and Bremer. See Tr. 379, 387.  Plaintiff

19  points to no further restrictions stemming therefrom, including any supported by the substantial evidence

20  in the record, which the ALJ should have included in his RFC assessment.

21  VI.   The ALJ Did Not Improperly Disregard the Vocational Expert's Testimony

22      If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

23  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

24  able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), §

25  416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the

26  Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock

27  v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

28      An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

posed by the ALJ. <u>Martinez v. Heckler</u>, 807 F.2d 771, 774 (9th Cir. 1987); <u>Gallant v. Heckler</u>, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. <u>Embrey v. Bowen</u>, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." <u>Embrey</u>, 849 F.2d at 422 (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001).

At the second hearing, the ALJ posed a hypothetical question containing limitations substantially similar to those he in included in his assessment of plaintiff's residual functional capacity. Tr. 474. In response to that hypothetical question, the vocational expert testified there were other jobs a hypothetical individual with those limitations could do. Tr. 472-74. Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the national economy. Tr. 26-27.

Plaintiff argues the ALJ erred by not including in the hypothetical question he posed any additional limitation with respect to standing, a sit/stand option, forgetfulness, dizziness and light-headedness. But as discussed above, the ALJ did not err in declining to adopt such further limitations. Plaintiff also contends the ALJ erred in not including any occasional limitations in the areas of concentration, persistence or pace and maintaining emotional behavior at work. However, plaintiff cites to no specific evidence in the record to indicate further limitations were warranted. As discussed above, the ALJ properly found plaintiff had at most a mild impairment in his social functioning.

To the extent an "occasional" limitation in the areas of concentration, persistence or pace could be said to be warranted, furthermore, the undersigned finds the ALJ's residual functional capacity assessment adequately accounted for that. Specifically, the ALJ limited plaintiff to only "simple routine and repetitive tasks not performed in a fast production paced environment, involving only simple work-related decisions and few work place changes." Tr. 23. Indeed, the substantial evidence in the record indicates his abilities in those areas were not even that limited. <u>See, e.g.</u>, Tr. 289, 291, 294, 311, 371, 375. For example, in late March 2004, plaintiff reported that he could "concentrate the whole time at work," that his mind did not wander and that he was able to "play video games at 5-6 hours at a time." Tr. 289. He also reported that

he would go to the woods and meditate for three to four hours "by thinking and reading his Bible." Tr. 294. In early March 2007, plaintiff denied "any difficulty persisting at tasks or pacing himself with chores or work activities." Tr. 375. As plaintiff related to Dr. Alvord at the time:

> . . . He provided an example of a rosary necklace he had constructed with included numerous wooden beads, strung on small wire links. The work was intricate and considered quite labor intensive. . . .

Id. In addition, when questioned, plaintiff indicated he had "no difficulty constructing an entire necklace in a couple of sittings." Id.

Plaintiff further argues the definitions of the jobs identified by the vocational expert contained in the Dictionary of Occupational Titles ("DOT"), require the individual performing those jobs to have more than occasional contact with co-workers and supervisors and to perform according to preset standards. A review of the DOT's descriptions of those jobs, however, in fact show that dealing with people is not a significant vocational requirement. See DOT 520.687-046 (Mexican food maker); DOT 520.637-066 (blending tank tender helper); DOT 524.687-022 (bakery worker); DOT 555.687-010 (scale operator); see also Tr. 472-75. As such, the undersigned finds the ALJ's limitation to only occasional contact with co-workers and supervisors to be adequate.

With respect to the issue of preset pace standards, plaintiff points to nothing in the descriptions of the above jobs contained in the DOT that mandate a preset pace standard, let alone describe what specific standard is required. Nor does the undersigned find any such standard set forth therein. Accordingly, this assertion too is entirely without merit. It is true that the vocational expert testified that the Mexican food maker job may at times require a faster pace (Tr. 477), but this would still leave the other three jobs noted above. The vocational expert also testified that there would be a pace and production level designated for the blending tank tender helper job, but that it would not be considered fast-paced. (Tr. 478). As such, the undersigned finds the ALJ did not err in determining there were other jobs existing in significant numbers in the national economy plaintiff could perform.

## CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was not disabled, and should affirm the ALJ's decision.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **May 15, 2009**, as noted in the caption.

DATED this 17th day of April, 2009.

Karen L. Strombom
United States Magistrate Judge